211 So.2d 881

**Andrew Lee WOMBLE**

**v.**

**STATE.**

**8 Div. 145.**

Court of Appeals of Alabama.

March 5, 1968.

Rehearing Denied May 7, 1968.

Chas. D. Rosser, Tuscumbia, for appellant.

MacDonald Gallion, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

Womble was convicted of stealing $69.00 from Carl Utley who owned and operated a gasoline filling station. His sentence was for five years. He appeals from the judgment of conviction.

The tendencies of the State's evidence were that early one morning Womble was in the building near the cash till. A customer saw him standing "behind the desk over next to the window."

The desk drawer was open. The customer told the station attendant that he saw Womble with "some money in his hand." The attendant "broke and ran in there."

The attendant stated that he had counted the money in the station. There was $70.00 in paper money on the right side of the drawer. The drawer had been locked.

The attendant saw Womble with his left hand on the desk drawer. Only a single dollar bill was in the place where the $70.00 had recently been.

The attendant testified as to this episode in part as follows:

"A. I said 'Put the money back in the drawer.' He said 'I haven't got it.' I said 'I said put the money back in the drawer.' He said 'I haven't got it. That fellow going around the restaurant got your money.'

"MR. SMITH CONTINUES: All right, now, this square that I have drawn here, does it reasonably and accurately represent the location of Carl's Restaurant?

"A. Yes, sir.

Q. And, at that time, he said 'That man going around the restaurant has got your money?'

"A. Yes, sir.

"Q. All right, now, I will ask you this. After you had that conversation, did he do anything or say anything else to you?

"A. No, sir.

"Q. All right, after you had the conversation, tell us what happened then.

"A. I went out of the station and Pete Bowling was standing between the drink boxes. I said 'Pete, don't let him out of the station. I am going down here to tell Mr. Utley and see what he wants to do about it.'

"Q. All right, what did you do then?

"A. I went on down to the restaurant and told Mr. Utley what happened and then we started out of the restaurant and Mr. Womble was running around the station.

"Q. Tell us what happened then.

"A. He started up toward the restaurant and Mr. Utley stopped him out there and asked him about the money and he denied having it. Mr. Utley told him to just stay right there and that he would call the law and see who got the money. Mr. Utley went in the restaurant to call the law, and when he did, Mr. Womble jumped in his car and took off.

\* \* \* \* \* \*

"A. When I ran in the station and told him the first time to put the money back in the drawer and he denied having it. The second time I told him, he turned loose of the drawer and when he come up, he had the tire tool in his hand.

"Q. Was it in his left hand or his right hand?

"A. It was in his left hand.

"Q. All right, sir, now during this time, did he ever take his right hand out of his coat pocket?

"A. No, sir.

"Q. All right, what did you do, Mr. Smith, when he picked up the tire tool?

"A. I made my way to the door to get out."

Utley got in his car and found Womble. He testified in part:

"Q. All right, sir, and after you left the restaurant, pursuing Mr. Womble, when was the next time—when and where were the next time you saw him?

"A. At the intersection of highways 20, 72 and 157. I guess it is the old Tuscumbia Highway. It is a gravel road that comes around behind Arnold's Truck Stop, and he was just before coming back out on the highway and he was stopped and he was out of his car and there was a patch of sage grass there. He was out of his car a few steps and he was kind of squatted down in the sage grass. I turned in toward him and he got back up and got in his car and come out by me and went up highway 57.

"BY THE COURT: 157?

"A. 157.

"BY THE COURT: Now this gravel road you are talking about, is that south of Arnold's Truck Stop?

"A. Yes, sir.

"BY THE COURT: The old Leighton Pike Highway?

"A. Yes, sir.

"MR. SMITH CONTINUES: This would be in which direction from your restaurant?

"A. It would be east.

"Q. And approximately how far?

"A. I would say a couple of miles.

"Q. You lost sight of his car from the time you left your restaurant? Is that correct?

"A. Yes, sir.

"Q. And when you again saw him, you say he was outside of his car, kneeling down in some sage grass?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. Mr. Utley, tell us what he did and what you did after you pulled up there and, you say, he jumped in his car and took off.

"A. Well, I backed out on the highway and took out after him and he turned to the right on what they call Three Mile Lane, going into Spring Valley. I followed him on down to the end of that lane. It comes to a dead end. He turned left and got in the ditch. I pulled on in the driveway of Mr. Chaney's and asked the lady if I could use the phone. I asked her to call the Highway Patrol and she showed me where the phone was and said 'You call them.' I called the Highway Patrol.

"Q. All right, now, when Mr. Womble ran his car over in the ditch, did he get out of the car?

"A. The last time I seen him, he was still in it."

A pursuing policeman described the capture thus:

"A. I told Mr. Womble to stop. I hollered at him and told him to give up —that he might as well come on in. He just kept running, so I ran on out to where I could see him and he went off into the edge of the creek. I ran out to where I could see him and I got ap-

proximately as close as from here to the wall back there, and he got on a foot log and was attempting to walk the foot log. I hollered at him and told him that if he didn't stop that I would shoot the log out from under him—shoot his feet out from under him or something to that effect. He said 'Go ahead and shoot', so I stood there and told him to come back. I kept talking to him to get him to take his eye off of the log—there was swift water under him—and when he did, he fell in, and then he came on back out.

"Q. All right, now when you were having this conversation, Mr. Cain, how far were you from him?

"A. Oh, almost as far as from here to the wall back there.

"Q. That back wall?

"A. Yes, sir.

"Q. Did you come closer to him as you were talking to him?

"A. Yes, sir, I walked on up. When he fell in, I ran on up there.

"Q. When he fell in the creek, how far were you from him?

"A. Well, after he fell in and when he came back to the bank, I was only as far as from here to the blackboard from him, because I ran when he fell in.

"Q. Mr. Cain, were you armed on that occasion?

"A. Yes, sir, I had a riot gun.

"Q. When Mr. Womble got out of the creek, did you point the gun at him, or what happened then?

"A. I held the gun like this and told him to start walking, and he said 'I am just as big as you are', and you can't take me in.

"Q. Did he advance on you with his fists?

"A. Yes, sir, and when he did, I stroked him with the butt of the gun, catching him right in the chest, and it knocked

him down and I put the handcuffs on him."

## II.

Appellant's first two argued points concern three rulings allowing the State, on direct examination, to ask leading questions.

■ The use of such questions on examination in chief is frowned on both at common law and by statute. Code 1940, T. 7, § 444. Two broad exceptions are recognized: (1) preliminary enquiries, e. g., witness's name, address and occupation; and (2) enquiries as to matters not in dispute. Other exceptions are given in opinions (Blunt v. Strong, 60 Ala. 572), and in § 444, supra.

■ Also, a reviewing court under the harmless error rule (Supreme Court Rule 45) will look to the answer given, even though the question is flagrantly suggestive of the answer.

■ The first point is against the following question (R. 29):

"Q. * * * after he said something else to you, what did you do, if anything?" The witness, after objection was overruled, answered, "I ran into the station."

Initially, we observe that the witness had just answered that the "he" referred to (a Mr. Pete Bowling) had said something else to the witness. Therefore, the question did not dredge up material not already in evidence.

Next, we do not think, "What did you do?" discloses any predilection by the questioner as to what he may hope the witness will say. See Judge Harwood's perceptive opinion in Williams v. State, 34 Ala.App. 603, 42 So.2d 500. We conclude the question did not lead.

■ The second complaint involved the question to Mr. Utley (R. 76), "* * * have you instructed your employees on the manner in which they are to account for the money that they take in * * * ?"

The "yes" or "no" answer test is rejected by the *Williams* opinion as too rigid. This question is a good illustration of the fallacy of such a test.

Wigmore, Evidence (3d Ed.), § 769, points out that an offending question is invidiously leading when it suggests so as to allow the witness to be supplied with "a false memory." The text continues:

"* * * Questions may legitimately suggest to the witness the *topic* of the answer; they may be necessary for this purpose where the witness is not aware of the next answering topic to be testified about, or where he is aware of it but its terms remain dormant in his memory until by the mention of some detail the associated details are revived and independently remembered. Questions, on the other hand, which so suggest the *specific tenor of the reply as desired by counsel* that such a reply is likely to be given irrespective of an actual memory, are illegitimate."

In this context which we adopt as comporting with our cases, we find no fault with the question. The witness was directed to a topic and not to a tenor. See Donnell v. Jones, 13 Ala. 490, at 507.

█ Third, Mr. Utley's being also asked what the procedure as to what the attendants were supposed to do in accounting for receipts from one shift to another was unobjectionable. No suggestion was used in the phrasing.

Moreover, the enquiry, though material, could not evoke an answer injurious to the defendant. It is well nigh axiomatic that people who handle money for another must account for it in some way. The topic verges on a matter not in dispute.

### III.

█ Over objection (R. 52) the State was allowed to ask on redirect of the attendant, "* * * what aroused your suspicions * * * about Mr. Womble * * * ?" The answer was: "Well, when I was counting the money, I noticed he kept looking at me and looking at the drawer all the time I was counting the money. I just had a funny feeling that he was up to something." No request was made to exclude the last sentence of the answer.

The defense had beforehand cross examined the witness as to Womble's seeing him opening the desk drawer and counting the money. Since the answer on redirect was recapitulation of what had been related on cross, even though the conclusory "funny feeling" was added, nevertheless Rule 45 would cover any error.

### IV.

█ The last claim of error is alleged to have been occasioned by the failure of the trial judge to declare a mistrial. However, we find no motion made for mistrial.

All rulings of the court on the episode (R. 105–109) were against the State. Hence, there is no occasion for our review. Act No. 249, approved June 24, 1943, § 10, does not apply; rather Code 1940, T. 15, § 389, governs here.

Aside from review by writ of error and perhaps Act No. 249, supra, the requisites laid down by Brickell, C. J., in Ex parte Knight, 61 Ala. 482, at 486, are still valid:

"* * * The question must however be reserved—it must be presented for the consideration and decision of the primary court, and the fact of its presentation, and its reservation for the consideration of this court, must plainly appear on the record, * * * *"

The judgment below is due to be

Affirmed.

PRICE, Presiding Judge (dissenting):

The incident concerning the testimony of Mr. Utley, the owner of the service station, appears in the record as follows:

"Q. Now, Mr. Utley, you have heard the testimony about the money left in the drawer and put in the drawer and

so forth. Now, have you instructed your employees on the manner in which they are to account for the money that they take in in operation of the service station?

"MR. ROSSER: I object to Mr. Smith leading the witness, Judge.

"BY THE COURT: I overrule the objection. He can ask whether he instructed them. He didn't ask him how he instructed them.

"A. Yes, sir.

"MR. SMITH CONTINUES: Now, Mr. Utley, would you just tell the court and jury in your own words what the boys are supposed to do, if anything, with the money that they receive when they come on shift and the money that they take in? Just explain it to us please.

"MR. ROSSER: I object to this as leading the witness, Your honor.

"BY THE COURT: I overrule the objection."

The instructions given by an employer to his employees, not in the presence of defendant, are inadmissible in evidence. Glover v. State, 21 Ala.App. 423, 109 So. 125. A witness cannot testify to what another person was "supposed to do." Smarr v. State, 260 Ala. 30, 68 So.2d 6.

I find it unnecessary to decide whether the proper ground of objection was interposed to the above questions, since I am of opinion there was reversible error in overruling the defendant's objection to the question to the station attendant as follows:

"Q. Now, what aroused your suspicions, Mr. Smith, about Mr. Womble when you went out to wait on Pete Bowling that had not caused you concern when you went out to wait on the other customers?

"MR. ROSSER: We object to calling for the working of his mind, Judge.

*    *    *    *    *    *

"BY THE COURT: I am going to overrule the objection."

This question called for testimony immaterial and irrelevant to the issue in the case, and "could have no other effect than to convey to the jury the witness's belief that the defendant was the guilty party, contrary to our jurisprudence that a witness is never allowed to express an opinion or suspicion as to the guilt or innocence of an accused." State v. Borde, 209 La. 905, 25 So.2d 736; State v. Chevallier, 213 La. 528, 35 So.2d 135. See also Martin v. State, 18 Ala.App. 434, 92 So. 913; Lee v. State, 42 Ala.App. 101, 154 So.2d 45.

I believe the judgment should be reversed.

## ON REHEARING

CATES, Judge.

Counsel for Womble calls our attention to the following episode which arose during cross-examination of the State's witness, Cain:

"BY MR. ROSSER:

"Q. Mr. Cain, did you examine him to see what he had on his person?

"A. At that time?

"Q. Yes, sir.

"A. No, sir, I just put the handcuffs on him and started carrying him to the car.

"Q. Did you examine him after you got him to the jail?

"A. We did after we got him to jail. We searched him in jail, yes, sir.

"Q. What did you find on him?

"A. On him, we found 42 cents in change, $16.00 in one dollar bills and a five dollar bill.

"Q. $21.42?

"A. Yes, sir.

"Q. Where did you find it?

"A. I found it in his right pocket, front pocket.

"Q. You didn't find $64.00?

"A. No, sir.

"Q. In your search and in trailing him or tracking him, did you find any money?

"A. No, sir.

"Q. Did you ever find any more money anywhere in connection with your investigation of that trial?

"A. I didn't go back to that area where I arrested him, no, sir. I have never been back to that area since then.

"Q. Did you find any more money on him or about him or in connection with your investigation of that event that morning other than the $21.42?

"A. No, sir.

"Q. Mr. Cain, when you captured this boy, did he appear under the influence of some narcotics or barbiturates?

"A. I would say that he wasn't normal, yes, sir. What it was, I couldn't say but, to me, he wasn't normal.

"Q. Did he make any statements to you as to why he was running?

"A. No, sir.

"MR. ROSSER: I believe that's all.

"BY THE COURT: Anything further?

"MR. SMITH: Mr. Rosser—

"(At this time, there was a conference at the Judge's bench between the Court, the Solicitors for the State and the attorney for the defendant out of hearing of the Court Reporter and the jury.)

"After Conference:

"BY THE COURT: Go ahead, please.

"MR. SMITH: Just a moment, the District Attorney has gone after something.

"BY MR. SMITH: Jim, would you mark this for identification, please? This is State's exhibit F.

"(A bottle of pills were marked for identification.)

"MR. ROSSER: The defendant moves for a mistrial on the basis that the prosecuting attorneys displayed before the jury certain articles which, I presume, they will attempt to put into evidence, knowing that the same was obtained by an illegal search, knowing that the same could have been done outside of the presence of the jury.

"BY THE COURT: Overrule the motion, please.

"MR. ROSSER: We except.

"BY THE COURT: Mr. Bailiff, take the jury back to the room.

"BY THE COURT TO THE JURY: Ladies and gentlemen, I again instruct you as I did before, don't talk to anybody about the case and don't allow anybody to discuss the case with you or make any suggestions to you and don't discuss it among yourselves, please. Go with the Bailiff, please, back in the room there.

"(Jury left courtroom)

"MR. ROSSER: Let the record show that the prosecuting attorney walked in before the jury with a big envelope in his hands and extracted therefrom a bottle containing some red pills in the presence of the jury and requested the court reporter to mark them for identification in the presence of the jury.

"MR. SMITH: Let the record show that before Lieutenant Cain was put on the stand, the State's Attorney and Mr. Charles Rosser, the attorney for the defendant, at the request of the Court and after the matter was brought to the attention of the Court, by the prosecuting attorneys, went outside the presence and hearing of the jury with the witness, Lieutenant Cain, and asked Lieutenant Cain what was found when the car was examined. Lieutenant Cain stated that red birds, or the bottle of pills referred to, was found in the car. Let the record further show that before the envelope was brought into the courtroom and before the pills were taken from the envelope, that the State's Attorney called Mr. Rosser, the attorney for the defendant, to the bench, and there, in the presence of the Judge, stated to him that he intended

to offer in evidence the pills or redbirds referred to and that Mr. Rosser stated that he would object to them if they were offered. At that time Mr. Rosser went back to the counsel table. Mr. Charles E. McCutchen went out of the courtroom and got the envelope and brought it into the courtroom and during this entire time, Mr. Rosser, having reasonable grounds to know what the envelope contained and what the State's Attorneys intended to do, did not ask the Court to exclude the jury, and did not object to the State's Attorney asking the Court Reporter to mark the bottle of pills for identification.

"BY THE COURT: All right, Mr. Rosser, you do object to these pills being introduced into evidence, is that right?

"MR. ROSSER: Let me go off the recore for a second.

"BY THE COURT: Off the record.

"(At this time there was a conference at the bench between the Court, the Solicitors for the State and the attorneys for the defendant.)

"After conference:

"MR. SMITH: The State's Attorneys would like the record to further show that when the pills were taken from the envelope by Mr. McCutchen and handed to myself, that I held them in my right hand and that I did not wave them or stick them up or do anything other than walk over and hand them to the court reporter, and, in a moderate tone of voice, asked him to please mark them for identification.

"MR. ROSSER: I offer this for the record. The pills were observed by the defendant's counsel sitting at the counsel table and appeared to have been made visible, maybe not purposely, but were made visible to the jury, and the pills in question appeared to be what is commonly known as redbirds.

"BY THE COURT: Well, I am not a pharmacist and I don't know what they are. Let's move on.

"BY THE COURT TO THE WITNESS ON THE STAND: Mr. Cain.

"A. Yes, sir.

"BY THE COURT: Were you there when the car of the defendant was searched there by the side of the road?

"A. No, sir, I wasn't present when the car was searched.

"BY THE COURT: Do you know whether or not they had a search warrant for it?

"A. No, sir, I do not.

"BY THE COURT: Well, I will say now for the record that unless they show me there was a search warrant, I am going to sustain the objection to the search.

"BY THE COURT TO THE BAILIFF: Bring the jury back in, please.

"(At this time, the jury returned to the jury box.)

"BY THE COURT: All right, go ahead, please.

"MR. SMITH: No further questions.

"MR. ROSSER: No questions.

"BY THE COURT: Are you through with this witness?

"MR. SMITH: Yes, sir.

"BY THE COURT: All right, thank you Mr. Cain. You can claim your attendance."

In his brief on submission, appellant had argued as follows:

"5. The Court erred in overruling defendant's motion for a mistrial on page 90 [sic 98] of the transcript of evidence.

"On page 89 [sic 97] of the testimony, after Appellant had finished cross examining a police officer who was appearing as a state's witness, the record shows that the prosecuting Attorney stated: 'Jim, would you mark this for identification please? This is State's exhibit F.' The record then shows at the top of page 90 that a bottle of pills were marked for identification. At this point, Appellant moved for a mis-

trial on the basis that the items which the State's Attorney had identified as being 'State's exhibit F' were actually the product of an illegal search, and that the said items were displayed to the jury.

"Mr. Smith, for the State, admitted that the item was a bottle of 'red birds.'

"Although the court did not allow the 'red birds' to be put in evidence, Appellant contends that the State's conduct in displaying them to the jury and in stating in front of the jury that 'This is State's exhibit F' was so prejudicial to the Appellant that a mistrial should have been declared. Especially in this so in view of the fact that Appellant first informed the State and the court outside of the hearing of the jury that he objected to the introduction of these pills. See Mr. Smith's statement on page 90 of the transcript.

"Appellant contends that this conduct of the state falls within that category of conduct so often said by the Supreme Court to be so prejudicial as to require a mistrial. Here, however, the court did not even admonish the jury to disregard what they had been told was 'State's exhibit F.' "

It is not here needful to go into the State or Federal law of searching cars as exposited in the majority opinion of Yeager v. State, 281 Ala. 651, 207 So.2d 125. This, because here the trial judge outside the hearing of the jury went into witness's knowledge of the State's possession.

The prosecution never formally tendered the bottle of pills except to have them tagged for identification.

In Kabase v. State, 31 Ala.App. 77, 12 So.2d 758, Simpson, J., opined:

"The action of the court, in ruling the shoes out of evidence and in refusing to have them returned to the courtroom, seems to have been based upon the belief that they did not become evidence in the case because the solicitor did not make the stereotyped remark, after exhibiting and identifying them, 'I hereby offer the shoes in evidence.' But this is an inept construction of what transpired and the constituents of presenting a fact before the triors thereof—the jury. The method of presenting such evidence (real evidence) in a trial is to properly identify it and exhibit it before or to the jury, as was done here. Then it becomes evidence.

" 'Demonstrative or real evidence, or evidence by inspection, is such evidence as is addressed directly to the senses of the court or jury without the intervention of the testimony of witnesses, as where various things are exhibited in open court.' * * * The tenor of its proffer is immaterial. It becomes evidence—the fact it imports—when it is properly identified and exhibited before the jury in open court for their inspection. Of such import are the foregoing authorities.

"Our courts have used similar expressions in describing the admission of this character of evidence. * * *"

In Thomas v. Ware, 44 Ala.App. 157, 204 So.2d 501, we stated in part:

"The entry of a mistrial is not lightly to be undertaken. Since the law presumes the present jury as good as a future one, the entry should be only a last resort, as in cases of *otherwise* ineradicable prejudice.

" 'Mistrial' has been defined by this court in Long v. City of Opelika, 37 Ala.App. 200, 66 So.2d 126, wherein Judge Price said:

" '* * * The term "mistrial" aptly applies to a case in which a jury is discharged without a verdict. * * *

" ' "In legal effect a mistrial is equivalent to no trial at all, and is declared because of some circumstance indicating that justice may not be done if the trial continues. The word is not ordinarily used to indicate a *mere erroneous ruling of law,* but generally is used to specify such fundamental errors in a trial as to

vitiate the result." 58 C.J.S. Mistrial page 834.' (Italics added.)

\* \* \* \* \* \*

"We note that in § 100 [T. 30, Code], the terms 'manifest necessity' and 'the ends of justice would otherwise be defeated' are used. These standards are stronger against a presumption of error than those employed in Supreme Court Rule 45, where *probable* injury to a substantial right of a party is the yardstick.

"We expressly hold that a motion for mistrial—which implies a miscarriage of justice if the trial goes on—does not include either a motion to strike out or exclude testimony as a lesser prayer for relief. We rest this holding on the language in Clark v. Hudson, 265 Ala. 630, 93 So.2d 138 (hn. 7)."

Prior knowledge as to the bottle of pills being the fruit of an illegal search would have supported the alternative remedy of a pre-trial motion to suppress. Brown v. State, 42 Ala.App. 429, 167 So.2d 281, as modified in 277 Ala. 108, 167 So.2d 291.

▇▇▇ The availability of this procedure should be considered in the factual frame of the jury's having but a fleeting view of the bottle and of the pertinence of the judge's observation that a pharmacist's testimony would be needed to identify them as contraband.

Aggregating these factors, we find that the trial judge did not arbitrarily abuse the discretion to declare or not to declare a mistrial. A ruling on a motion for a mistrial by express language of § 100, T. 30, Code 1940, is not to be measured by the more lenient standard of Supreme Court Rule 45. Where a statute speaks, a court rule must give way, except only in exclusively judicial matters. Ex parte Foshee, 246 Ala. 604, 21 So.2d 827.

Footnote 6 of Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed. 2d 408, says in part "this Court has not yet ruled on the role of harmless error in search and seizure cases."

In using the expression "miscarriage of justice" our mistrial statute thereby approximates the Mississippi standard of error without injury. There Rule 11 (1952), 215 Miss. 601, uses virtually the same standard as set out in the proviso of § 4(1) of the English Criminal Appeal Act of 1907. Archbold (36th Ed.), § 939.

The *Supreme Court of Mississippi* in Reed v. State, 237 Miss. 23, 112 So.2d 533, used the concept that another "impartial jury \* \* \* could not reach a different result." Substituting "judge" for "jury" here, we consider that this record shows no "miscarriage of justice" in the occasion of the defendant's moving for a mistrial.

This conclusion holds even though technically the jury got a momentary glimpse of a bottle holding unanalyzed red pills. Under numerous decisions it was open to the defense to move the court to direct the jury to disregard this brief view and to confine themselves to the other evidence. We see no reason to think that the court should vitiate the entire trial.

In brief on rehearing, appellant, in countering Part IV of the opinion on original delivery, submits:

"Finally, Appellant strongly urges the court to reconsider and reverse for the error assigned as No. 6, viz., the prosecutor stating that the testimony being given by a witness is not true. The majority opinions point out that the error was not reserved. Appellant in answer, says that this was so grossly and irreparably prejudicial as to require a reversal anyhow. See the authorities cited in Appellant's initial brief.[1] Appellant

---

1. McGhee v. State, 41 Ala.App. 669, 149 So.2d 1; Rogers v. State, 275 Ala. 588, 157 So.2d 13; Langley v. State, 32 Ala. App. 163, 22 So.2d 920; Blevins v. State, 204 Ala. 476, 85 So. 817; Bynum v. State, 35 Ala.App. 297, 47 So.2d 245; Anderson v. State, 209 Ala. 36, 95 So. 171.

also submits that his counsel cannot waive his rights without his knowledge or consent. In short, if this statement by the prosecutor hurt the Appellant and Appellant submits that it did—then the trial court erred in not protecting Appellant's rights to a trial free from such tactics." The transcript (R. 105, et seq.) shows:

"Q. And, Mrs. Tate, on this occasion, was witness named Kenneth Smith examined?

"A. That's right.

"Q. And did you take down his testimony?

"A. Yes, sir.

"Q. All right, I will ask you if, at this time, did he or did he not testify, on this preliminary hearing, Kenneth Smith, that after he had gone out to service Pete Bowling's truck, and when he ran back in the station, he found Mr. Womble there with a tire tool in his hand?

"A. Yes, sir.

"MR. SMITH: Wait just a minute. We object to that, and move to exclude the answer on the grounds that it is an improperly asked question, that she is testifying from her personal recollection, that the transcript is the best evidence itself, that the question, as asked to Kenneth Smith, was not put to this lady. He was not asked this question and did not deny it, and we object to it as improper impeachment—the manner of impeachment is wrong and the way he asked the question is improper and we object to it and move to exclude the answer on the grounds that she answered after being requested not to do so before I had an opportunity to object to the question.

"MR. ROSSER: The witness did testify—

"BY THE COURT: Just a minute.

"(The Judge, the Solicitors for the State, the attorney for the defendant and the witness left the courtroom and had a conference out of presence and hearing of the court reporter and the jury.)

"After conference:

"BY THE COURT: Mrs. Tate, whenever any lawyer asks you a question and the other lawyer objects to it, wait just a second before you answer the question and let me rule on it, please.

"MR. ROSSER: Mrs. Tate, read from your record of the transcript of the testimony given by Kenneth Smith at this preliminary hearing concerning what he testified the defendant had in his hand when he walked in the service station.

"MR. SMITH: I object to that. It is immaterial, irrelevant, it is improper impeachment, the form of the question is improper, it calls for a conclusion on the part of this witness as to what part of the transcript concerns the question asked, the transcript is not the best evidence and I object to it on those bases and I would like a voir dire.

"BY THE COURT: Voir dire to what please?

"MR. SMITH: As to her knowledge about what she is going to testify about.

"BY THE COURT: I overrule the motion for voir dire.

"MR. SMITH: Well, we except to that and we would like to assign further grounds to the motion as to whether or not this lady is testifying as to her personal knowledge or remembers what was said or whether or not she is reading from these shorthand notes and who took them and when they were taken and what the circumstances were.

"BY THE COURT: All right. Mrs. Tate, did you take the transcript on the preliminary hearing?

"A. Yes, sir.

"BY THE COURT: Is that what you are reading from?

"A. Yes, sir.

"BY THE COURT: You took it yourself?

"A. Yes, sir.

"BY THE COURT: On the day the preliminary hearing was held on Andrew Lee Womble?

"A. That's right.

"BY THE COURT: All right, I overrule the objection.

"MR. SMITH: Are you overruling my objection to the question as it was asked?

"BY THE COURT: Yes, sir.

"MR. SMITH: We except.

"BY THE COURT: All right. Mrs. Tate, go back and read the two portions from your transcript of Kenneth Smith's testimony that I had you mark for me out there.

"MR. SMITH: We would like to further object on the ground that the Court is asking her to read something she has not been asked about and the jury has no idea about—there is two portions of it—what the question is that she is answering by reading this and we object to it on those bases.

"BY THE COURT: All right. It is a question and answer that you have got marked, is it not?

"A. Sir?

"BY THE COURT: The portion which you have marked is a question and answer directed to Kenneth Smith, is that right?

"A. That's right.

"BY THE COURT: All right, and it is true and correct as you took it down, is that right?

"A. Yes, sir.

"MR. SMITH: We object to that as being impeachment evidence offered for substantive and leading this jury to believe that it is substantive evidence when it is impeachment by the Court's statement that it is true and correct.

"BY THE COURT: Well, you objected to it—all right, I am not going to argue. . Go ahead and read it, please, mam.

"MR. SMITH: We object.

"BY THE COURT: I overrule the objection.

"A. 'When you got back into the service station, what, if anything, did Mr. Womble have in his hand?' Answer: 'A tire tool.'

"MR SMITH: We move to exclude the witness's answer on the same ground.

"BY THE COURT: I overrule the motion."

■ True, the prosecutor did not concede the correctness of what Mrs. Tate related that Smith (the filling station attendant) had formerly testified. However, a statement made in support of a motion addressed to the trial judge is basically a legal argument with only factual illustration. We do not think that it is to be treated on the same plane as an argument as to the effect of the evidence addressed to the jury at the close of the case.

Washington v. State, 259 Ala. 104, 65 So.2d 704, and Johnson v. State, 272 Ala. 633, 133 So.2d 53, both show that a motion for new trial is as near as Alabama comes to a Plain Error doctrine, limited to "ineradicable prejudice." The grounds used by the prosecutor to support his motions addressed to the judge here do not prima facie partake of ineradicable prejudice under the decisions of our Supreme Court. Nor was a motion for new trial made here.

[The immediately foregoing paragraph is only my individual opinion regarding what I have there sought to say. This because Johnson, J., does not concur as to the language which I use.]

Moreover, the point of the trial at which this episode took place was before the

court charged the jury. The defense thus had the opportunity to submit a properly drawn instruction that matters alluded to in counsel's argument are not to be taken by the jury as evidence. Lane v. State, 85 Ala. 11, 4 So. 730.

Application overruled.